LODGED

ORIGINAL

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

2019 AUG -7 PM 2:24

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE
BY _____

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

AUG 0 7 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | Case No. |
| Anthony Allen Bennett, | **ED19-0418M** |
| Defendant | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of June 12, 2019, in the county of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§  841(a)(1), (b)(1)(C) | Distribution of a controlled substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Jeffry Jones, DEA TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   8/7/19

_____
*Judge's signature*

City and state:   Riverside, California

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

AUSA: Billy Joe McLain x6702

**AFFIDAVIT**

I, Jeffry Jones, declare and state as follows:

## I.  **PURPOSE OF AFFIDAVIT**

1.  This affidavit is made in support of a criminal complaint and arrest warrant against ANTHONY ALLEN BENNETT for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.

2.  This affidavit is also made in support of an application for a warrant to search the following premises and person, as described more fully in Attachments A-1 to A-3:

a.  2221 Coriander Circle, Corona, California 92879 (the "SUBJECT PREMISES 1") as described more fully in Attachment A-1;

b.  23261 Gerbera Street, Moreno Valley, CA 92553 (the "SUBJECT PREMISES 2"), as described more fully in Attachment A-2; and

c.  The person of ANTHONY ALLEN BENNETT, as described more fully in Attachment A-3.

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of a controlled substance) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), as described more fully in Attachment B. Attachments A-1 to A-3 as well as Attachment B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF TFO JONES

5. I have been a Police Officer with the Riverside Police Department ("RPD") for 16 years. I was promoted to the rank of detective in September 2007. In January 2012, I was assigned to the Drug Enforcement Administration's ("DEA") Southern California Drug Task Force's High Intensity Drug Trafficking Area ("HIDTA Group 50"). I am currently a Task Force Officer ("TFO") with the DEA. HIDTA Group 50 is based in Riverside, California and is comprised of special agents and officers from the Customs and Border Protection Air and Marine Operations ("AMOC"), the Internal Revenue Service ("IRS"), the Ontario Police Department ("OPD"), RPD, the San Bernardino Sheriff's Office ("SBSO"), the Riverside Sheriff's Office ("RSO"), and the Chino Police Department ("CPD").

6. My primary duty is investigating large-scale drug crimes. During the course of my duties, I regularly review reports related to drug trafficking and crimes associated with drug trafficking, including homicide. As part of my duties, I regularly review crime statistics, conduct surveillance, make

2

arrests, interview suspects, and prepare investigations for
criminal filings in state and federal court.

7.    Prior to my employment with the RPD, I was employed by
the Oceanside Police Department for eight and a half years and
the San Diego Sheriff's Department for five years.

8.    I completed the Basic Peace Officer Academy and hold
an Advanced Peace Officer Standards Training ("POST")
Certificate.  My investigative training includes a POST
certified 84-hour Basic Investigations Course, an 80-hour
Narcotics Investigations Course, and certification as a drug
recognition expert following the completion of a drug
recognition course at Palomar College.  Throughout my 28-year
law-enforcement career, I have received training by seasoned
detectives on gang and drug-related criminal investigations.  I
am a member of the California Narcotics Officers Association,
and I regularly attend gang and drug-related trainings.

9.    I have participated in over 100 drug and gang
investigations involving violations of state and federal drug
laws.  These investigations and arrests involved: (1) unlawful
importation, manufacture, possession with intent to distribute,
and distribution of controlled substances; (2) money laundering;
and (3) controlled-substance conspiracies.  During these
investigations, I have debriefed defendants, witnesses, and
confidential sources, conducted surveillance, monitored wire
interceptions, executed search warrants, seized controlled
substances and related assets, and made arrests for controlled-
substance offenses.  These investigative procedures have allowed

3

me to understand the methods employed by large-scale drug
traffickers.  In particular, I am knowledgeable of the manner in
which drug traffickers facilitate their illegal drug trade by
avoiding law enforcement detection with the use of cellular
telephone technology, coded communications, false or fictitious
identities, hidden compartments, and counter surveillance
measures.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

10.  On eight separate occasions from January 4, 2019 to
July 10, 2019, BENNETT sold fentanyl pills[1] to either an
undercover officer or confidential source working with HIDTA/DEA
("CS").  The number of pills BENNETT sold on each occasion
ranged from four to 500.

11.  On one of those eight occasions, June 12, 2019, before
selling 101 fentanyl pills to the CS, BENNETT met with three
individuals, including Andrew Isaac SOSA and Francisco SOSA,
JR., at SUBJECT PREMISES 2, minutes before notifying the CS that
he had just received the fentanyl pills he intended to sell the
CS.  That day, Nadine Alexandra MAHAR was a passenger in

---

[1] The pills BENNETT sold on January 4, February 27, March 19, May
23, May 28, and July 10, 2019 have been submitted to the DEA lab
for drug testing.  But the results have not yet come back.  The
pills sold on June 6 have not been sent to the DEA lab.  The pills
sold on each of those dates are all similar in appearance to the
101 pills BENNETT sold on June 12, 2019, which DEA lab results
have confirmed contain a net weight of 11 grams of fentanyl (N-
Phenyl-N[1-(2-phenylethyl)-4-piperidinyl]Propanamide).          As
discussed  in  greater  detail  below,  based  on  my  training,
experience,  and  investigation  of  this  case,  I  believe  the  pills
BENNETT sold on the seven other occasions are fake Oxycodone pills
that contain fentanyl.

BENNETT's vehicle from the time BENNETT left SUBJECT PREMISES 1
through the time when BENNETT sold fentanyl pills to the CS.

12. BENNETT's California Driver's License lists SUBJECT
PREMISES 1 as his address, and law enforcement officers have
observed BENNETT entering and leaving SUBJECT PREMISES 1 on
multiple occasions over the last five months.

### IV. STATEMENT OF PROBABLE CAUSE

13. Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

#### A. INVESTIGATION BEGINS – A FENTANYL OVERDOSE IN RIVERSIDE LEADS TO BENNETT

14. On September 2, 2018, in Riverside County, R.R. died
of an acute fentanyl overdose.  Based upon toll analysis of
R.R.'s cell phone records, investigators suspect R.R. purchased
the fentanyl pills that caused his death from Craiglist and that
BENNETT was the supplier.

#### B. JANUARY 4 DRUG SALE

15. I reviewed a January 8, 2019 report prepared by RPD
Detective Rogelio Serrato, from which I learned the following:

a.    On November 14, 2018, Detective Serrato, along
with other members of RPD, began searching Craigslist ads for
"Roxy Short," "Roxy Goggles," and "Roxy Board Shorts," which,
based on my training and experience, I know are slang terms used
to describe Oxycodone pills.

b.    On January 2, 2019, Detective Nathan Asbury,
acting in an undercover capacity, began texting an unidentified

individual ("UI") using the number 505-916-8780, [2] who he believed was associated with a person selling "Roxy 30 shorts" for $25 dollars on Craigslist.  The UI indicated he was in a "350z" and agreed to meet Detective Asbury at a Wendy's located in Corona.

      c.   At the Wendy's, Detectives Serrato and Asbury both observed a white or Hispanic male sitting alone in the driver's seat of a silver Nissan 350z (CA 7KWM630).  A records check for the license plate showed that it was registered to "Rachel Whiteside" and "Adam Bennett" at SUBJECT PREMISES 1.  A further records check for SUBJECT PREMISES 1 also revealed that BENNETT lived there.  No drugs were purchased on January 2.

      d.   I believe BENNETT was using the number 505-916-8780, based on my investigation of this case and the controlled drug purchases from BENNETT that were coordinated with that number on January 4, February 27, and March 19, 2019.

      e.   On January 4, 2019, Detective Serrato and the UI again arranged by text to meet so Detective Serrato could purchase "blues."  Before the deal, officers surveilled SUBJECT PREMISES 1 and saw the same Nissan 350z parked in the driveway with BENNETT in and around the vehicle.

---

1.    A reverse-gateway search was performed to determine the service provider for 505-916-8780.  That search revealed that the number was a voice-over internet-protocol line ("VoIP"). VoIP numbers are typically created through internet applications that provide anonymous virtual phone numbers that conceal a user's true identity.  I do not have the subscriber information for the internet application that may have created the number 505-916-8780.

f.    After Detective Serrato agreed to purchase four "blues" for $100, Detective Serrato met with the UI who he identified as BENNETT from BENNETT's DMV photograph, in a parking lot in Corona, and bought four pills for $100 dollars. During the sale, BENNETT was alone in the Nissan 350z (CA 7KWM630). Detective Serrato later looked up the drugs he purchased from BENNETT on "Drugs.com" and identified them as 30-mg Oxycodone pills.[3]

C.    **FEBRUARY 27 DRUG SALE**

16. I reviewed a March 6, 2019 report prepared by Detective Serrato, from which I learned the following:

a.    On February 27, 2019, Detective Serrato, by text, arranged to meet BENNETT at a Wendy's parking lot in Corona to purchase "blues." At the meeting, BENNETT was the sole occupant of a black BMW 6-series with paper plates. BENNETT sold Detective Serrato four pills for $100.

b.    Detective Serrato looked up the pills he purchased from BENNETT on "Drugs.com" and identified them as 30-mg Oxycodone pills, but one of the pills was later analyzed with a MX908 drug testing device and tested positive for fentanyl.

D.    **MARCH 19 DRUG SALE**

17. Based on my review of a March 19, 2019 report prepared by Detective Asbury, and my review of text message communications and video surveillance from March 19, 2019, I know the following:

---

[3] Based on my investigation of this case, there is probable cause to believe these are fake Oxycodone pills that contain fentanyl.

18. On March 17 and 18, BENNETT texted Detective Asbury "Need Blues." On March 19, Detective Asbury asked "You got any black?," meaning heroin, to which BENNETT texted "Not rn." Detective Asbury then asked "Tiles?," meaning fentanyl, to which BENNETT responded "I got those pressed blues with fent." Based on my training, experience, and investigation of this case, I believe "pressed blues with fent" referred to the blue pills BENNETT sold to Detective Serrato previously.

a. As arranged by text message, on March 19, Detective Asbury met with BENNETT on Hidden Valley Parkway in Corona and purchased four pills for $80. When BENNETT handed over the pills, he confirmed they were "pressed." BENNETT's vehicle was a silver/black 2015 Ford Explorer (CA 8DWG926), which surveillance officers saw BENNETT drive back to SUBJECT PREMISES 1 about ten minutes after the sale.

b. Two of the four pills were tested using an MX908 device. The testing revealed "acetaminophen/paracetamol," but did not identify fentanyl. Based on my training and experience, acetaminophen and paracetamol are common binders for pills containing fentanyl and it is often difficult to field-test pills for fentanyl because of the limited amount of fentanyl contained in pills relative to the other ingredients.

**E.   MAY 23 DRUG SALE**

19. Based on my review of a May 24, 2019 report prepared by Detective Asbury, my discussions with other law enforcement officers, and my own work on this investigation, I know the following:

8

a.    On May 23, 2019, the CS[4] arranged by phone to purchase twenty fentanyl pills from BENNETT.  Just prior the planned meeting, the CS spoke to a female on the phone, who coordinated the meeting spot.  The female also asked how many pills the CS wanted, to which the CS said twenty.  The female then confirmed the quantity.

b.    About five minutes later, a black BMW parked next to the CS's vehicle in the parking lot of the Galleria at Tyler Mall, in Riverside.  BENNETT got out of the passenger's side of the BMW and entered the CS's vehicle.  THE BMW driver was a dark-haired female.  While BENNETT was in the CS's vehicle, he sold the CS twenty pills for $400.  BENNETT and the CS discussed a potential discount and BENNETT said he could sell 100 pills for $1,300 or fifty pills for $15 each.  The CS then counted twenty pills and a few moments later BENNETT exited the CS's vehicle and re-entered the BMW on the passenger's side.[5]

---

[4] The CS was convicted for misdemeanor reckless driving in April 2016.  In March 2017, the CS was convicted of felony possession of drugs for sale (Cal. HSC § 11351), Possession of Marijuana for Sale (Cal. HSC § 11359), and Possession for Sale of Sedatives or Benzodiazepine Drugs (Cal. HSC § 11375).  The CS was sentenced to 36 months probation and 120 days jail (suspended).  The CS is currently on probation and is a paid confidential source.

[5] Before each of the CS's drug purchases from BENNETT, discussed here, the CS met with law enforcement officers during which time the CS and his vehicle were searched for drugs and the CS was given money for the controlled buy.  THE CS was also provided with a recording/transmitting device.  Any description of conversations between the CS and BENNETT at the deals discussed in this affidavit is based on my review of reports, my own observations, my discussions with other law enforcement officers who were present, and my review of those recordings.  Any quotes are based on my review of the recordings. After each of the CS's

**F.   MAY 28 DRUG SALE**

20.   Based on my review of a May 29, 2019 report prepared by Detective Asbury, my review of video and audio recordings from May 28, 2019 and related text message communications, my discussions with other law enforcement officers, and my own observations, I know the following:

a.   On April 11, 2019, Detective Asbury received text messages from BENNETT saying "This is my new number don't use this one anymore" and then writing "951-435-2276."[6]

b.   On May 28, 2019, BENNETT texted Detective Asbury asking "Need blk clear 30mg oxys acid subs hmu" and "Xanax." Based on my investigation of this case, I believe these messages were asking Detective Asbury whether he needed (respectively) heroin, methamphetamine, oxycodone, lysergic acid diethylamide (LSD), suboxone, or Xanax, and if so, "hit me up."  Additional text message communications discussed the purchase of "30s," i.e., Oxycodone.  Detective Asbury and BENNETT eventually agreed to the sale of ten pills for $200.

c.   On May 28, 2019, Detective Asbury met with BENNETT in a parking lot of Corona Hills Plaza in Corona.  At the meeting, Detective Asbury purchased ten blue pills for $200. During the purchase, BENNETT said he had "black" for sale and showed Detective Asbury a small amount of heroin as well as a

---

drug purchases from BENNETT, the CS met with law enforcement officers, where the pills and any unused money was retrieved.

[6] Subscriber records have not yet been requested for this phone number.

photograph of heroin on BENNETT's phone.  BENNETT was driving an
older model blue two-door Mercury sedan (CA 3PBC140).

**G.   MAY 30 SURVEILLANCE OF SUBJECT PREMISES 1**

21.  On May 30, 2019, TFO Albert Alvarado set up stationary
surveillance of SUBJECT PREMISES 1 and saw BENNETT in the
garage.  He also saw the following vehicles in the driveway, all
of which were cars BENNETT used during the drug deals discussed
above and *infra*:  a silver Nissan 350z (CA 7KWM630), a black BMW
6-series with paper plates, and a black/silver Ford Explorer (CA
8DWG926).  In addition, TFO Alvarado saw a dark Mercury (CA
PBC1410), which BENNETT used during some of the drug deals
discussed above and *infra*, parked across the street from SUBJECT
PREMISES 1.

**H.   JUNE 6 DRUG SALE**

22.  Based on my review of video and audio recordings from
June 6, 2019, my discussions with other law enforcement
officers, and my own observations, I know the following:

a.   On June 6, 2019, as arranged by text/phone,
BENNETT, driving a black BMW from SUBJECT PREMISES 1, met with
the CS in Corona.  BENNETT got into the CS's vehicle where he
sold the CS fifty-one blue pills for $850. During the deal,
BENNETT told the CS that he gave the CS an extra pill.

**I.   JUNE 12 DRUG SALE AND MEETING AT SUBJECT PREMISES 2**

23.  Based on my review of a Cellebrite phone report taken
from the CS's phone, video and audio recordings from June 12,
2019, my discussions with the CS, other law enforcement
officers, and my review of DMV records, I know the following:

a.    On June 12, 2019, the CS received a text message at 12:57 p.m. from BENNETT, using the number 909-640-4233,[7] asking "you want the 100 forsure going to go grab them right now for you." The CS responded at 12:58 p.m. "100% I need that" and "Grab them ill be in the area g."

b.    At about 2:30 p.m., BENNETT left SUBJECT PREMISES 1 in a black BMW with a female passenger later identified as MAHAR. After leaving SUBJECT PREMISES 1, BENNETT drove to Moreno Valley and parked the BMW down the street from SUBJECT PREMISES 2. At about 3:23 p.m., BENNETT walked across the street to SUBJECT PREMISES 2, began speaking to several individuals on the front porch of SUBJECT PREMISES 2, and then returned to the BMW.

c.    At about 3:34 p.m., a black Dodge Charger arrived at SUBJECT PREMISES 2, and three males (identified as Francisco Enrique Tello, SOSA, and SOSA, JR.) exited the Charger and approached BENNETT who exited the BMW. Then all three males and BENNETT entered SUBJECT PREMISES 2. MAHAR remained in the BMW.

d.    At about 3:47 p.m., BENNETT and SOSA, JR. exited SUBJECT PREMISES 2 and walked to BENNETT's BMW, where BENNETT entered the front driver's side and SOSA, JR. entered the front passenger's side. MAHAR was sitting in the rear passenger's seat. Moments later, SOSA, JR. exited the BMW, returned to the black Dodge Charger, and left with Tello and SOSA at about 3:50

---

[7] I have received toll and subscriber records for this number, but there is no user information listed.

p.m.   BENNETT drove away in the BMW with MAHAR at that same
time.

e.   At 3:59 p.m., the CS received a text message from
BENNETT stating "Just got them gonna be heading back rn."  Based
on my investigation of this case, I believe BENNETT was letting
the CS know that he now had the 100 fentanyl pills he had agreed
to sell the CS.

f.   After BENNETT left SUBJECT PREMISES 2, he stopped
at a shopping plaza parking lot in Moreno Valley, and briefly
met with the driver of a Chevy Truck, while MAHAR, who was
sitting in the front seat, appeared to reach toward the back
seat for something.  Minutes later, BENNETT met with a second
person in a silver car and then left the shopping plaza parking
lot.

g.   At 4:20 p.m., BENNETT texted the CS "Im doing a
drop in moval rn I can meet in about 30 minutes."  Based on my
investigation of this case, I believe BENNETT was telling the CS
in shorthand that he was delivering drugs in Moreno Valley
("moval") right now.

h.   At about 4:21 p.m., BENNETT drove to a different
shopping plaza parking lot in Moreno Valley and parked the BMW.
MAHAR then exited the front passenger seat and began
manipulating something in the back-seat area before returning to
the front passenger seat.

i.   At about 4:29 p.m., a male approached the BMW on
foot, entered, and then exited about a minute later and walked

away with what appeared to be a baggie of drugs in his left hand.  MAHAR was in the BMW when this happened.

      j.   At about 4:43 p.m., BENNETT pulled into a 76 gas station in Riverside, California, and met with another person.[8]

      k.   At 4:47 p.m., BENNETT texted the CS asking "Can u meet at the burger king off tyler at 515."  At about 5:11 p.m., BENNETT pulled into the Burger King parking lot on Tyler Street in Riverside.  At 5:14 p.m., BENNETT texted the CS stating "Ok I'm here just try to hurry got to drop another jar rn."[9]

      l.   A few minutes later, the CS arrived at the Burger King parking lot and parked next to the BMW.  BENNETT exited the BMW and entered the CS's vehicle, while MAHAR was sitting in the passenger seat of the BMW.  Inside the CS's vehicle, a video recording shows BENNETT handing over a package of blue pills.  The CS gave BENNETT $1,300.  The two discussed buying and selling pills, and BENNETT offered a discount if the CS bought more than 100 pills.  Before leaving the CS's vehicle, BENNETT confirmed that the CS had given him the correct amount of money.

      m.   After they were collected from the CS, the pills were sent to a DEA laboratory where an exam revealed 101 pills with a net weight of 11 grams of N-Phenyl-N[1-(2-phenylethyl)-4-piperidinyl]Propanamide, which is more commonly known as fentanyl.

---

[8] MAHAR was in the 76 mini mart, when the apparent drug deal occurred.  She re-entered the passenger's side of the BMW before BENNETT left the 76.

[9] A jar refers to 100 fentanyl pills.

24. The next day, on June 13, 2019, BENNETT texted the CS saying "Actuallywe got some clear," meaning methamphetamine. BENNETT sent another text saying "My stuff is quality though if you want to grab what we have ill weigh it out" and "I'm dropping a jar off at green river my girl is scaling out what we have ill let you know rn." Based on my investigation of this case, I believe BENNETT was explaining that he had high quality methamphetamine and that he was dropping off 100 fentanyl pills ("a jar"). Also, based on my investigation of this case, including surveillance of MAHAR and BENNETT together in June and July 2019, I believe BENNETT was referring to MAHAR weighing methamphetamine when he texted his "girl is scaling out what we have." Ultimately, the CS did not purchase any methamphetamine from BENNETT.

**J.   ADDITIONAL INVESTIGATION OF SUBJECT PREMISES 2**

25. Following the June 12 meeting between BENNETT, SOSA, and SOSA, JR., at SUBJECT PREMISES 2, I conducted a further investigation of that address and the people BENNETT met there.[10]

26. As part of my investigation, I conducted a toll analysis of the number BENNETT used on June 12 to coordinate the sale of 101 fentanyl pills with the CS. My toll analysis revealed that BENNETT and the telephone number 951-224-1613 communicated 463 times between March 20, 2019 and June 1, 2019. SOSA – who met BENNETT at SUBJECT PREMISES 2 on June 12 –

---

[10] According to the Riverside County Tax Office, Francisco Valencia Sosa owns SUBJECT PREMISES 2.

provided that number (951-224-1613) as his phone number in the Narcotics Registration with the Riverside County Sheriff's Department.[11]

27. Toll records also show fourteen communications between BENNETT and SOSA on June 12 from 12:43 p.m. to 3:32 p.m. At about 3:34 p.m., SOSA arrived at SUBJECT PREMISES 2 and met BENNETT. Less than thirty minutes later, BENNETT notified the CS that he had picked up the fentanyl pills.

28. DMV records show that SOSA, Jr. (the individual who entered the BMW with BENNETT and MAHAR on June 12 outside of SUBJECT PREMISES 2) listed SUBJECT PREMISES 2 as his residence. SOSA also listed SUBJECT PREMISES 2 as his residence with the DMV and in the Narcotics Registration with the Riverside County Sheriff's Department.

29. During my investigation, I also reviewed a June 27, 2017 RPD Report regarding SOSA and SUBJECT PREMISES 2 as well as Riverside County court records for SOSA, from which I learned the following:

a.   On June 22, 2017, a search warrant was executed at SUBJECT PREMISES 2 where officers found, in the garage, two scales with methamphetamine residue, nine live ammunition rounds, camouflage body armor, and over 45 grams of methamphetamine (gross weight) in bags. SOSA was arrested at the scene and his phone contained messages discussing drug sales. As a result of this incident, SOSA was convicted in June

_____

[11] Subscriber records have been requested, but not yet received for this phone number.

16

2018 of California Health and Safety Code § 11378 (possession for sale of methamphetamine).

30. Based on my investigation of this case, I believe BENNETT coordinated the purchase of fentanyl pills from SOSA at SUBJECT PREMISES 2 on July 12, BENNETT picked those pills up at SUBJECT PREMISES 2, made several drug sales to other individuals, and then sold 101 of those pills to the CS later that afternoon.

**K.    JULY 10 DRUG SALE**

31. Based on my review of screenshots from the CS's phone, audio and video recordings from July 10, 2019, and discussions with other law enforcement officers, I know the following:

a.    On June 27, 2019, BENNETT texted the CS "Need the jar $1200" and then followed up "Or do you want to go halfs with me on a 1000 picking it up now." The CS responded, "I got them that same day when I need it I need it," to which BENNETT replied "Okay well hmu I got jars now." Based on my investigation of this case, I believe BENNETT was asking the CS whether he wanted 100 fentanyl pills ("a jar") or if the CS wanted to split the cost of purchasing 1000 fentanyl pills.

b.    On June 28, 2019, BENNETT sent a Snapchat message to the CS stating "HMU when you need that jar ill hook you up or if you know people trynna grab jars send them my way and ill hook u up." The CS responded, "I might have some1 wat will u throw me," to which BENNETT replied, "Ill just hook u up when you pick up or idk we can work out something."

c.    On July 8, 2019, the CS sent Snapchat messages to BENNETT asking "How much half boat I want shop thru u" and stating "I need a good price."[12]  BENNETT and the CS negotiated a deal to purchase 500 pills from BENNETT for $4,500.

d.    On July 10, 2019, at about 11:35 a.m., BENNETT left SUBJECT PREMISES 1 in a blue two-door Mercury sedan (CA 3PBC140).  About five minutes later, BENNETT met the CS on Esperanza Drive in Corona and entered the CS's vehicle.  A recording captures BENNETT entering the CS's vehicle, the CS handing over a wad of money (which was $4,500), BENNETT handing over a package of blue pills (later confirmed to be 500 pills), and then BENNETT counting money while the CS counted pills.  During this time, BENNETT said the pills were in bags of 100 and that he was likely going to pick up additional pills the next day.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

32. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

---

[12] A "half boat" is 500 pills.  A "boat" is 1000 pills.

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

19

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[13]

33. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[13] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

   34. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

35.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress SOSA's, SOSA, JR.'s, BENNETT'S, and/or
MAHAR's, thumb- and/or fingers on the device(s); and (2) hold
the device(s) in front of SOSA's, SOSA, JR.'s, BENNETT'S, and/or
MAHAR's, face with his or her eyes open to activate the facial-,
iris-, and/or retina-recognition feature.

36. Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII. <u>CONCLUSION</u>

37. For all of the reasons described above, there is
probable cause to believe that ANTHONY ALLEN BENNETT has
committed a violation of 21 U.S.C. § 841(a)(1): Distribution of
a Controlled Substance.  There is also probable cause that the

items to be seized described in Attachment B will be found in a search of the property and person, as described in Attachments A-1 to A-3.

_____
Jeffry Jones, TFO
DEA Task Force Officer

Subscribed to and sworn before me
this __7__ day of August, 2019.

_____
UNITED STATES MAGISTRATE JUDGE

25